AUSA: RITA MAXWELL

| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | 25 MAG 2954 |
|---|---|
| UNITED STATES OF AMERICA<br><br>          v.<br><br>JERMAINE STUBBS,<br>          a/k/a "Bugga," and<br>DAVEON GREENE,<br>          a/k/a "Dee,"<br><br>                    Defendants. | **COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 371, 922(a)(1)(A), 922(a)(5), 922(g)(1), 933(a)(1), and 2; 21 U.S.C. § 841.<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

ALLEN SANTOS, being duly sworn, deposes and says that he is a Special Agent with the Department of Justice, Division of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and charges as follows:

**COUNT ONE**
(Unlicensed Dealing of Firearms)

1.   Between at least in or about March 2025 through at least in or about August 2025, in the Southern District of New York and elsewhere, JERMAINE STUBBS, a/k/a "Bugga," the defendant, not being a licensed importer, licensed manufacturer, or licensed dealer of firearms within the meaning of Chapter 44, Title 18, United States Code, willfully and knowingly engaged in the business of importing, manufacturing, and dealing in firearms, and in the course of such business shipped, transported, and received a firearm in interstate and foreign commerce, and aided and abetted the same, to wit, STUBBS obtained firearms outside the state of New York and sold those same firearms in New York, New York.

(Title 18, United States Code, Sections 922(a)(1)(A) and 2.)

**COUNT TWO**
(Interstate Transfer of a Firearm to an Out-of-State Resident)

2.   Between at least in or about March 2025 through at least in or about August 2025, in the Southern District of New York and elsewhere, JERMAINE STUBBS, a/k/a "Bugga," the defendant, not being a licensed importer, licensed manufacturer, licensed dealer, or licensed collector of firearms within the meaning of Chapter 44, Title 18, United States Code, willfully and knowingly transferred, sold, traded, gave, transported, and delivered a firearm to another individual, said person not being a licensed importer, licensed manufacturer, licensed dealer, or licensed collector of firearms within the meaning of Chapter 44, Title 18, United States Code, knowing and having reasonable cause to believe that said person was not then residing in the state in which STUBBS was then residing, and aided and abetted the same, to wit, STUBBS, then a

resident of North Carolina, sold, and transported for delivery, firearms to an undercover law enforcement officer, a person STUBBS had reasonable cause to believe resided in the state of New York.

(Title 18, United States Code, Sections 922(a)(5) and 2.)

## COUNT THREE
(Possession of a Firearm After a Felony Conviction)

3.  On or about July 11, 2025, in the Southern District of New York and elsewhere, JERMAINE STUBBS, the defendant, knowing he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed firearms, to wit, (1) one Polymer 80 9 caliber semi-automatic pistol with no serial number; (2) one Springfield Armory Hellcat 9 caliber semi-automatic pistol, serial number BA119275; (3) one Taurus G2C 9 caliber semi-automatic pistol, serial number ACL491994; (4) one Smith & Wesson Model 469 9 caliber semi-automatic pistol, serial number TAA3657; and (5) one Taurus G3 9 caliber semi-automatic pistol, serial number ADJ665573, and the firearms were in and affecting commerce.

(Title 18, United States Code, Section 922(g)(1).)

## COUNT FOUR
(Unlicensed Dealing of Firearms)

4.  Between at least in or about August 2025 through at least in or about September 2025, in the Southern District of New York and elsewhere, DAVEON GREENE, a/k/a "Dee," the defendant, not being a licensed importer, licensed manufacturer, or licensed dealer of firearms within the meaning of Chapter 44, Title 18, United States Code, willfully and knowingly engaged in the business of importing, manufacturing, and dealing in firearms, and in the course of such business shipped, transported, and received a firearm in interstate and foreign commerce, and aided and abetted the same, to wit, GREENE obtained firearms outside the state of New York and sold those same firearms in New York, New York.

(Title 18, United States Code, Sections 922(a)(1)(A) and 2.)

## COUNT FIVE
(Interstate Transfer of a Firearm to an Out-of-State Resident)

5.  Between at least in or about August 2025 through at least in or about September 2025, in the Southern District of New York and elsewhere, DAVEON GREENE, a/k/a "Dee," the defendant, not being a licensed importer, licensed manufacturer, licensed dealer, or licensed collector of firearms within the meaning of Chapter 44, Title 18, United States Code, willfully and knowingly transferred, sold, traded, gave, transported, and delivered a firearm to another individual, said person not being a licensed importer, licensed manufacturer, licensed dealer, or licensed collector of firearms within the meaning of Chapter 44, Title 18, United States Code, knowing and having reasonable cause to believe that said person was not then residing in the state in which GREENE was then residing, and aided and abetted the same, to wit, GREENE, then a resident of North Carolina, sold, and transported for delivery, firearms to an undercover law

enforcement officer, a person GREENE had reasonable cause to believe resided in the state of New York.

(Title 18, United States Code, Sections 922(a)(5) and 2.)

## COUNT SIX
(Trafficking in Firearms)

6.    Between at least in or about August 2025 through at least in or about September 2025, in the Southern District of New York and elsewhere, DAVEON GREENE, the defendant, shipped, transported, transferred, caused to be transported, and otherwise disposed of a firearm to another person in and otherwise affecting interstate commerce, knowing and having reasonable cause to believe that the use, carrying, and possession of a firearm by the recipient would constitute a felony as defined in Title 18, United States Code, Section 932(a), and aided and abetted the same, to wit, GREENE sold firearms to an undercover law enforcement officer in New York, New York, with reasonable cause to believe that the buyer was trafficking the guns internationally.

(Title 18, United States Code, Section 933(a)(1).)

## COUNT SEVEN
(Possession with Intent to Distribute Narcotics)

7.    On or about September 15, 2025, in the Southern District of New York and elsewhere, DAVEON GREENE, the defendant, knowingly and intentionally distributed and possessed with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(1)(a).

8.    The controlled substance involved in the offense was mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(C).)

## COUNT EIGHT
(Conspiracy to Engage in Unlicensed Dealing of Firearms)

9.    Between at least in or about March 2025 through at least in or about September 2025, in the Southern District of New York and elsewhere, JERMAINE STUBBS, a/k/a "Bugga," DAVEON GREENE, a/k/a "Dee," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, trafficking in firearms, in violation of Title 18, United States Code, Section 922(a)(1)(A).

10.    It was a part and object of the conspiracy that JERMAINE STUBBS, a/k/a "Bugga," DAVEON GREENE, a/k/a "Dee," the defendants, and others known and unknown, not being licensed importers, licensed manufacturers, or licensed dealers of firearms within the meaning of Chapter 44, Title 18, United States Code, would and did willfully and knowingly

engage in the business of dealing in firearms, and in the course of such business would and did ship, transport, and receive firearms in interstate and foreign commerce, in violation of Title 18, United States Code, Section 922(a)(1)(A).

## Overt Acts

11.   In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about March 13, 2025, JERMAINE STUBBS, the defendant, traveled from North Carolina to Manhattan, New York with two firearms.

b.   On or about March 13, 2025, STUBBS sold two firearms to an undercover officer for approximately $2,300 in Manhattan, New York.

c.   On or about April 4, 2025, STUBBS traveled from North Carolina to Manhattan, New York with five firearms.

d.   On or about April 4, 2025, STUBBS, who arrived at the sale location with another individual ("Individual-1"), sold five firearms to an undercover officer for approximately $6,000 in Manhattan, New York. Following the sale, STUBBS placed a video call to a second individual ("Individual-2"), indicating that STUBBS intended to obtain more firearms to sell in New York.

e.   On or about July 11, 2025, STUBBS traveled from North Carolina to Manhattan, New York with five firearms.

f.   On or about July 11, 2025, STUBBS sold five firearms to an undercover officer for approximately $6,500 in Manhattan, New York.

g.   On or about July 18, 2025, STUBBS, traveled from North Carolina to Manhattan, New York with four firearms.

h.   On or about July 18, 2025, STUBBS sold four firearms to an undercover officer for approximately $5,400 in Manhattan, New York.

i.   On or about July 29, 2025, STUBBS traveled from North Carolina to Manhattan, New York with five firearms.

j.   On or about July 29, 2025, STUBBS sold five firearms to an undercover officer for approximately $6,500 in Manhattan, New York.

k.   On or about August 5, 2025, STUBBS traveled from North Carolina to Manhattan, New York with two firearms.

l.   On or about August 5, 2025, STUBBS sold two firearms to an undercover officer for approximately $3,500 in Manhattan, New York.

  m. On or about August 9, 2025, STUBBS traveled from North Carolina to Manhattan, New York with four firearms.

  n. On or about August 9, 2025, STUBBS sold four firearms to an undercover officer for approximately $4,800 in Manhattan, New York.

  o. On or about August 31, 2025, STUBBS communicated with GREENE regarding GREENE engaging in firearms sales with the UC and STUBBS provided information to GREENE about how to communicate with the UC.

  p. On or about September 5, 2025, GREENE traveled from North Carolina to Manhattan, New York with three firearms.

  q. On or about September 5, 2025, GREENE sold three firearms to an undercover officer for approximately $3,600 in Manhattan, New York.

  r. On or about September 15, 2025, GREENE traveled from North Carolina to Manhattan, New York with three firearms.

  s. On or about September 15, 2025, GREENE sold three firearms to an undercover officer for approximately $4,400 in Manhattan, New York.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

12. I have been involved in the investigation of this matter, and I base this affidavit on that experience, as well as on my conversations with other law enforcement agents, and my examination of various reports, recordings, photographs, communications, and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

13. Since in or about February 2025, the ATF has been investigating JERMAINE STUBBS, a/k/a "Bugga," the defendant, for firearms trafficking. Specifically, over the course of seven transactions or attempted transactions from in or about March 2025 through in or about August 2025, STUBBS sold an undercover law enforcement officer (the "UC") twenty-seven firearms, as well as ammunition and magazines. As set forth below, these sales typically followed a pattern whereby STUBBS and the UC exchanged electronic messages via an encrypted messaging application to negotiate the type and price of firearms, then, once agreed upon, STUBBS traveled from North Carolina to New York to sell the UC firearms at a pre-designated location. STUBBS and the UC then continued to communicate, until STUBBS arrived in the vicinity of a particular location in Lower Manhattan ("Location-1"). At that point, STUBBS would enter the UC's vehicle, which was equipped with video and audio recording technology, to

5

complete the sale of firearms (from STUBBS) in exchange for cash (from the UC). In total, STUBBS sold the UC 27 firearms, including pistols, assault pistols, and a rifle, for a total of approximately $35,000. In or about August 2025, STUBBS was detained on state criminal charges in North Carolina. From jail, STUBBS, on recorded jail calls, communicated with DAVEON GREENE a/k/a "Dee," the defendant, about GREENE traveling to New York to sell firearms to the UC. GREENE then traveled to New York on two occasions and sold firearms to the UC in the same manner as STUBBS previously had done. GREENE sold the firearms to the UC after the UC told GREENE that the UC would ship the firearms in barrels to an island, which as set forth below, GREENE had reasonable cause to believe meant they would be shipped internationally. In total, GREENE sold the UC 6 firearms, for a total of approximately $8,000. On or about September 15, 2025, GREENE also sold the UC a bag of grayish powder wrapped in a clear plastic twist which, based on my training and experience and as set forth below, appears to be heroin.

      14.    Based on my conversations with the UC and other law enforcement officers, my review of law enforcement reports, electronic communications, recorded calls, and my participation in this investigation, I have learned, among other things, the following:

      a.    In or about February 2025, in New Jersey, the UC was introduced to STUBBS. During that introduction, the UC and STUBBS discussed the possible sale of firearms. In this initial meeting, the UC informed STUBBS, among other things, that the UC lived in New York City. STUBBS, who resided in North Carolina, informed the UC that he traveled on the bus to Chinatown, located in Lower Manhattan, New York, and the two discussed the possibility of meeting in Chinatown for gun sales. During that meeting, STUBBS and the UC exchanged telephone numbers.

      b.    In or about February 2025, the UC and STUBBS made plans for STUBBS to sell firearms to the UC through messages on an encrypted cloud-based mobile and desktop messaging application ("Encrypted Messaging Application-1"), that allows users to send electronic messages, as well as to make voice and video calls. Screenshots of certain of those messages are found below, with STUBBS's messages appearing in white (on the left side of the screenshots) and the UC's in green (on the right side of the screenshots).

6



For example, on or about on or about February 25, 2025, STUBBS sent an image of a black firearm to the UC (left-most image). In a subsequent message, the UC wrote, "how much" and STUBBS responded, "same thing." Based on my training and experience, as well as my review of these messages and other electronic communications between STUBBS and the UC, I believe that this conversation referred to STUBBS agreeing to procure and sell firearms to the UC.

### STUBBS Sells Firearms to the UC

15. Based on my conversations with the UC and other law enforcement officers, my review of law enforcement reports, my review of visual and audio recordings,[1] and my participation in surveillance, I have learned, among other things, the following:

### The March 13, 2025 Sale

a. After their initial meeting in or about February 2025, JERMAINE STUBBS, a/k/a "Bugga," the defendant, and the UC continued to communicate using Encrypted Messaging Application-1, regarding the sale of firearms and a planned sale for STUBBS to sell firearms to the UC on or about March 13, 2025 in Manhattan, New York.

b. On or about March 12, 2025, STUBBS sent the UC the below image, which appears to be a screenshot of his path from North Carolina to New York and expected arrival time.

---

[1] The narratives and quotes from visual and audio recordings are based on draft transcriptions that are subject to revision.



c. On or about March 13, 2025, at approximately 8:55 a.m., the UC received a message from STUBBS over Encrypted Messaging Application-1 that STUBBS was waiting at the pre-arranged location, in the vicinity of Location-1. At approximately 10:14 a.m., the UC received a call from STUBBS, which was monitored and recorded, during which STUBBS asked for the UC's location, and the UC advised STUBBS that the UC was near the proposed buy location, in the vicinity of Location-1.

d. On or about March 13, 2025, at approximately 10:18 a.m., the UC reached the proposed sale location, and STUBBS entered the UC's vehicle which was equipped with law enforcement audio and video recording equipment that recorded the interaction. During the meeting inside the vehicle, STUBBS sold the UC two firearms (subsequently identified as (1) one Polymer 80 Privately Made Firearm with a Glock slide serial number AGMB019 and (2) one Glock, Model 30, .45 caliber, semi-automatic pistol seral number BUSW559), as well as magazines and ammunition. The UC inspected the firearms and gave STUBBS approximately $2,300 in cash for the firearms, magazines, and ammunition. Upon completion of the firearms sale and discussions, STUBBS exited the UC's vehicle and departed the area.

<u>The April 4, 2025 Sale</u>

e. After the firearms sale on or about March 13, 2025, STUBBS and the UC continued to communicate via Encrypted Messaging Application-1 regarding additional firearms sales and arranged for another purchase of firearms on or about April 4, 2025.

f. On or about April 4, 2025, at approximately 9:02 a.m., the UC sent a message and placed a call to STUBBS asking for STUBBS's location, and STUBBS indicated that he was waiting at the proposed buy location, which was in the vicinity of Location-1. At approximately 9:18 a.m., the UC arrived at the proposed buy location and observed STUBBS, who was with

8

another individual ("Individual-1"). The UC lowered the UC's window and indicated for STUBBS to walk farther down the block where there was less congestion.

g. On or about April 4, 2025, at approximately 9:19 a.m., STUBBS approached the UC's vehicle, which was equipped with law enforcement audio and video recording equipment that recorded the interaction, and placed a black duffle bag in the rear passenger side of the vehicle. STUBBS then entered the front passenger seat of the UC's vehicle. At this time, STUBBS reached into the bag and handed the UC five firearms (subsequently identified as (1) one SCCY CPX-2 9 caliber semi-automatic pistol, serial number 167943; (2) one SCCY CPX-2 9 caliber semi-automatic pistol, serial number 054608; (3) one Canik TP9 Elite SC 9 caliber semi-automatic pistol, serial number 22CB21939; (4) one Springfield Armory XDM-45 45 ACP caliber semi-automatic pistol, serial number MG539071; and (5) one Palmetto State Armory PA-15, multi-caliber semi-automatic AR pistol, serial number DCSF102621). The UC inspected the firearms and gave STUBBS $6,000 in cash. While in the car, STUBBS indicated to the UC that he brought Individual-1 with him. STUBBS also video called a woman, Individual-2, from the UC's vehicle, and stated to that STUBBS was going to come back, which, based on my training and experience and participation in the investigation, meant back to New York, and the UC wanted "more," which based on my training and experience and participation in the investigation, meant "more firearms." Upon completion of the firearms sale and subsequent conversations, STUBBS exited the UC's vehicle, walked eastbound on Canal Street with Individual-1, counted the money he had received from the UC in exchange for firearms, fanned out the cash, and began to dance.

### The July 11, 2025 Sale

h. On or about July 9, 2025, the UC received a message on Encrypted Messaging Application-1 from a certain phone number ending in 2928 (the "2928 Number") with the message "yoo this bugga." Based on the conversation and later events, as set forth below, I believe STUBBS operated the 2928 Number. The UC and STUBBS then communicated regarding a possible firearms sale. During that conversation, on or about July 10, 2025, STUBBS sent the UC the below screenshot regarding his planned bus travel to New York on or about July 10 and 11, 2025.

9



i. On or about July 11, 2025, at approximately 9:11 a.m., the UC placed a call via Encrypted Messaging Application-1 to STUBBS, who advised that STUBBS was approximately forty minutes away. At approximately 9:44 a.m., STUBBS sent the UC a message on Encrypted Messaging Application-1 advising that he had arrived at the bus drop-off location.

j. On or about July 11, 2025, at approximately 10:08 a.m., the UC arrived in the vicinity of the proposed buy location, which was in the vicinity of Location-1. STUBBS approached the UC's vehicle and removed a book bag from STUBBS's back and entered the front passenger seat of the UC's vehicle, which was equipped with law enforcement audio and video recording equipment that recorded the interaction. At this time, STUBBS reached into the book bag and handed the UC five firearms (subsequently identified as (1) one Polymer 80 9 caliber semi-automatic pistol with no serial number; (2) one Springfield Armory Hellcat 9 caliber semi-automatic pistol, serial number BA119275; (3) one Taurus G2C 9 caliber semi-automatic pistol, serial number ACL491994; (4) one Smith & Wesson Model 469 9 caliber semi-automatic pistol, serial number TAA3657; and (5) one Taurus G3 9 caliber semi-automatic pistol, serial number ADJ665573) as well as magazines and ammunition. The UC inspected the firearms and gave STUBBS $6,500 in cash. During this interaction, the UC indicated to STUBBS, in sum and substance, that he ships the firearms in barrels. Upon completion of the firearms sale and discussions, STUBBS exited the UC's vehicle and departed the area.

The July 18, 2025 Sale

k.  After the firearms sale on or about July 11, 2025, STUBBS and the UC continued to communicate via Encrypted Messaging Application-1 regarding additional firearms sales and arranged for another purchase of firearms on or about July 18, 2025. During that conversation, on or about July 17, 2025, STUBBS sent the UC the below screenshot regarding his planned bus travel to New York on or about July 17 and 18, 2025.



l.  On or about July 18, 2025, at approximately 9:32 a.m., the UC received a message from STUBBS on Encrypted Messaging Application-1 advising that STUBBS was approximately ten minutes away from the proposed buy location, which was in the vicinity of Location-1. At approximately 9:52 a.m., STUBBS sent a message to the UC advising that STUBBS arrived at the bus drop-off location.

m.  On or about July 18, 2025, at approximately 9:48 a.m., the UC arrived in the vicinity of the proposed buy location. At approximately 10:03 a.m., STUBBS approached the UC's vehicle and entered the front passenger seat of the UC's vehicle, which was equipped with law enforcement audio and video recording equipment that recorded the interaction. At this time, STUBBS reached into a book bag and handed the UC four firearms (subsequently identified as (1) one Palmetto State Armory Rock 5.7 caliber semi-automatic pistol, serial number RK018292; (2) one Palmetto State Armory Dagger Compact 9 caliber semi-automatic pistol, serial number FG171474; (3) one Taurus G3 9 caliber semi-automatic pistol, serial number AEH570463; and (4) one Palmetto State Armory PA-15 multi-caliber semi-automatic AR pistol, serial number SCD846114). The UC inspected the firearms and handed STUBBS $5,400 in cash. Upon completion of the firearms sale and discussions, STUBBS exited the UC's vehicle and departed the area.

11

The July 29, 2025 Sale

n. After the firearms sale on or about July 18, 2025, STUBBS and the UC continued to communicate via Encrypted Messaging Application-1 regarding additional firearms sales and arranged for another purchase of firearms on or about July 29, 2025.

o. On or about July 29, 2025, at approximately 10:05 a.m., the UC received messages from STUBBS on Encrypted Messaging Application-1 advising that STUBBS arrived at the bus drop-off location. Law enforcement observed STUBBS walking toward the proposed buy location, which was in the vicinity of Location-1.

p. On or about July 29, 2025, at approximately 10:14 a.m., STUBBS approached the UC's vehicle, placed a bag in the rear passenger seat, and entered the front passenger seat of the UC's vehicle, which was equipped with law enforcement audio and video recording equipment that recorded the interaction. The UC took control of the bag and inspected five firearms (subsequently identified as (1) one Taurus G2C 40 caliber semi-automatic pistol, serial number ADJ744567; (2) one Taurus G3C 9 caliber semi-automatic pistol, serial number AGK531211; (3) one Taurus G2C 9 caliber semi-automatic pistol, serial number AGG277279; (4) one Taurus G2C 9 caliber semi-automatic pistol, serial number AEE409600; and (5) one Smith & Wesson M&P-15 multi-caliber semi-automatic rifle, serial number SY33985) that were inside the bag. One of the firearms, the rifle, was disassembled, and the UC asked STUBBS to assemble it for the UC. STUBBS showed the UC how to assemble the firearm, and said, in sum and substance, "that's why I don't keep it like that," which, in my training and experience, alluded to the fact that a disassembled rifle is easier to conceal and transport inside a bag than an assembled rifle. The UC handed STUBBS $6,500 in cash. Upon completion of the firearms sale and discussions, STUBBS exited the UC's vehicle and departed the area.

The August 5, 2025 Sale

q. After the firearms sale on or about July 29, 2025, STUBBS and the UC continued to communicate via Encrypted Messaging Application-1 regarding additional firearms sales and arranged for another purchase of firearms on or about August 5, 2025.

r. On or about August 5, 2025, at approximately 10:07 a.m., the UC arrived in the vicinity of the proposed buy location, which was in the vicinity of Location-1.

s. On or about August 5, 2025, at approximately 10:08 a.m., STUBBS exited a large white bus in the vicinity of 127 E. Broadway, New York, New York, and proceeded northbound toward Canal Street.

t. On or about August 5, 2025, at approximately 10:24 a.m., STUBBS approached the UC's vehicle carrying a bag and entered the front passenger side of the UC's vehicle. While in the vehicle, STUBBS handed the UC two firearms (subsequently identified as (1) one Glock 9 caliber semi-automatic pistol, serial number AHDY905; and (2) one Anderson Manufacturing AM-15 multi-caliber semi-automatic AR pistol, serial number 21029944) and stated that one of them was a fully automatic weapon. STUBBS also handed the UC an extended magazine that can hold up to 40 rounds of ammunition. Based on my training and experience, as well as my inspection of the magazine, I know that an extended magazine is a modified magazine that allows a firearm to hold relatively more bullets. The UC handed STUBBS $3,500 in cash. Upon

completion of the firearms sale and discussions, STUBBS exited the UC's vehicle and departed the area.

### The August 9, 2025 Sale

u. After the firearms sale on or about August 5, 2025, STUBBS and the UC continued to communicate via Encrypted Messaging Application-1 regarding additional firearms sales and arranged for another purchase of firearms on or about August 9, 2025.

v. On or about August 9, 2025, at approximately 10:25 a.m., the UC arrived in the vicinity of the proposed buy location, which was in the vicinity of Location-1.

w. On or about August 9, 2025, at approximately 10:26 a.m., law enforcement observed a large white bus in the vicinity of 127 E. Broadway, New York, New York. Law enforcement then observed STUBBS traveling on foot toward Location-1. A photo of STUBBS is found below.



x. On or about August 9, 2025, at approximately 10:41 a.m., STUBBS approached the UC's vehicle carrying a bag and entered the front passenger seat of the UC's vehicle, which was equipped with law enforcement audio and video recording equipment that recorded the interaction. After entering the vehicle, STUBBS removed four firearms (subsequently identified as (1) one Taurus GX4 9 caliber semi-automatic pistol, serial number 1GA73706; (2) one Glock 22 40 caliber semi-automatic pistol, serial number AGEH833; (3) one SCCY CPX-1 9 caliber semi-automatic pistol, serial number 646378; and (4) one Taurus G2C 9 caliber semi-automatic pistol, serial number ABK032520) from STUBBS's bag and handed them to the UC for inspection. The UC then handed STUBBS $4,800 in cash. STUBBS then counted the money and discussed future firearms sale transactions with the UC. Upon completion of the firearms sale and discussions, STUBBS exited the UC's vehicle and departed the area.

13

September 5, 2025 Sale

y. After the firearms sale on or about August 9, 2025, STUBBS was detained in North Carolina on state criminal charges. In jail calls STUBBS made, which were recorded, he contacted other individuals about selling firearms to the UC.

z. On or about August 31, 2025, at approximately 9:02 p.m., STUBBS spoke with an individual, who, based on the events described below, I believe was GREENE, on a recorded jail call. On the call, GREENE asked what STUBBS wanted GREENE to do and whether GREENE should "book it for tomorrow night." STUBBS then told GREENE to download Encrypted Messaging Application-1, and when GREENE indicated that GREENE might not be able to do so, STUBBS told GREENE to ask another individual for "Trini's number." As set forth above, "Trini" is the name the UC used in the UC's interactions with STUBBS. *See supra* ¶ 14(b). Based on my training and experience, I believe that in these conversations STUBBS and GREENE were discussing scheduling a possible firearms sale by GREENE to the UC, and that STUBBS provided GREENE the communication method he had used (Encrypted Messaging Application-1) and the name that STUBBS previously had used to contact (Trini's number). The call lasted approximately five minutes.

aa. On or about August 31, 2025, at approximately 9:07 p.m., the UC received a message from a phone number ending in 0066 (the "0066 Number"). The message read, "yoo dis bugga ppl D I just talk 2 him im ready whenever you are just hit my jaxk." As set forth above, "Bugga" is an alias for STUBBS. *See supra* ¶¶ 14(b), 15(h). For the reasons set forth below, I believe GREENE is the user of the 0066 Number. The UC responded by, like STUBBS, asking GREENE to use Encrypted Messaging Application-1. The UC and GREENE then continued to communicate via Encrypted Messaging Application-1.[2]

bb. On or about September 4, 2025, GREENE sent the UC a screenshot of GREENE's bus ticket from Greensboro, North Carolina to New York, New York on or about September 4 and 5, 2025. That screenshot is found below.

---

[2] GREENE communicated with the UC on Encrypted Messaging Application-1 using a different phone number that ended in 3891.

14



cc. On or about September 4, 2025, GREENE and the UC communicated regarding firearms GREENE would sell to the UC. On or about September 4, 2025, GREENE sent the UC a photo of firearms, which is found below.



dd. On or about September 5, 2025, the day of the planned sale, at approximately 9:57 a.m., GREENE messaged the UC and told the UC that GREENE was "in the tunnel shouldn't be much longer."

ee. Shortly thereafter, on or about September 5, 2025, GREENE arrived in the vicinity of Location-1, where the UC was in the UC's vehicle. GREENE wore a book bag. GREENE approached the UC's vehicle and entered the front passenger side of the UC's vehicle, which was equipped with law enforcement audio and video recording equipment that recorded the interaction. After entering the vehicle, GREENE reached into GREENE's book bag and retrieved a fanny pack. GREENE unzipped the fanny pack, displayed three firearms and placed it to GREENE's left. The UC removed and inspected each firearm from the fanny pack (subsequently identified as (1) one Smith & Wesson M&P 380 Shield EZ .380 auto caliber semi-automatic pistol, serial number RCD9325; (2) one Taurus GX2 9 caliber semi-automatic pistol, serial number AHB776532; (3) one Ruger EC9s 9 caliber semi-automatic pistol, serial number 453-88486). The UC then asked about the next thing, and GREENE handed the UC a clear twist containing white powder (which I believe to be cocaine). GREENE stated it was all GREENE could bring; GREENE also stated, in sum and substance, that GREENE's "lane" was "food, the fet." In context, and based on my training and experience, I believe that GREENE was conveying that GREENE's general area of business (*"lane"*) was providing narcotics, specifically heroin and/or fentanyl (*"food, the fet"*). The UC handed GREENE $3,600 for the firearms and $20 for the white powder believed to be cocaine. The UC also told GREENE, in sum and substance that the UC takes the firearms, puts them in barrels and "send them down." GREENE asked, in sum and substance, whether the UC "only like[s] hand guns? No big shits?" Based on my training and experience, "shits" is a term for

16

firearms. The UC indicated he could take bigger firearms. Upon completion of the firearms sale and discussions, GREENE exited the UC's vehicle and departed the area.

ff. On the same day, on or about September 5, 2025, at approximately after 1:00 p.m., GREENE and STUBBS communicated on a recorded call STUBBS made from the North Carolina jail. During the calls, GREENE and STUBBS discussed GREENE's firearms sale to the UC.

September 15, 2025 Sale

gg. After the firearms sale on or about September 5, 2025, GREENE and the UC continued to communicate via Encrypted Messaging Application-1 and other electronic messaging regarding additional firearms sales and arranged for another sale of firearms to the UC on or about September 15, 2025. On or about September 8, 2025, during a recorded call over Encrypted Messaging Application-1, the UC told GREENE that he was getting ready for another shipment, and stated, "we ship the shit down…we take it down, we break it down, we basically sell it to, to my island, you know what I mean? So like we sending down a barrel, like, next week. So, I'm trying see, you know what I mean, if I could get something before that barrel come, you know what I mean?" Based on my training and experience and my knowledge of this investigation, I believe that in that call, the UC told GREENE that he was shipping the firearms out of the United States, *i.e.*, to "my island."

hh. On or about September 15, 2025, at approximately 7:25 a.m., GREENE messaged that GREENE "just got on the turnpike." GREENE also messaged that she had the "dog food," which based on my training and experience, is a term for heroin.

ii. On or about September 15, 2025, at approximately 10:10 a.m., GREENE entered the UC's vehicle, which was equipped with law enforcement audio and video recording equipment that recorded the interaction, and was parked in the vicinity of Location-1. After entering the vehicle, GREENE reached into GREENE's bag and removed three firearms (subsequently identified as (1) one Palmetto State Armory, Palmetto Dagger Micro, 9 caliber semi-automatic pistol, serial number JD921211; (2) one Palmetto State Armory, Palmetto Dagger Fill Size-S, 9 caliber, semi-automatic frame, serial number SZF030437; and (3) one Draco, Micro Draco, 7.62 caliber, semi-automatic pistol, serial number PMD-14755-19), each of which GREENE handed to the UC. A still image of GREENE removing one of the firearms is found below.



GREENE then removed a green container with a plastic bag of a grayish powder inside, and said "my people said they didn't touch it, and I don't, I didn't do nothing to it." GREENE said that it was a "little over" 21 grams. The UC then handed GREENE $600 and said, it was for the "dog food," which based on my training and experience, meant heroin, and $4,400 for the firearms. Upon completion of the firearms sale and discussions, GREENE exited the UC's vehicle.

        jj.  On or about September 15, 2025, at approximately 10:18 a.m., GREENE was arrested by ATF agents shortly after GREENE exited the UC's vehicle.

        kk.  ATF weighed the plastic container of grayish powder that, based on my training and experience and GREENE's statements, I believe to be heroin. The preliminary approximate weight is 22.46 grams, which is consistent with GREENE's statement, in sum and substance, that she provided the UC with a "little over" 21 grams of what I believe to be heroin. A photo of the plastic container of grayish powder on a scale is found below.



16.     Based on my review of a photograph of JERMAINE STUBBS, the defendant, maintained on a law enforcement database and my observations from the gun sales set forth above, during which I conducted surveillance and saw the individual who sold firearms, as well as my review of numerous electronic communications and recorded calls between STUBBS and the UC, I believe that STUBBS is the individual who sold the UC firearms during the March 13, April 4, July 11, July 18, July 29, August 5, and August 9, 2025 meetings.

17.     Based on my review of a photograph of DAVEON GREENE, the defendant, maintained on a law enforcement database and my observations from the gun sales set forth above, during which I conducted surveillance and saw the individual who sold firearms, as well as my review of numerous electronic communications and recorded calls between GREENE and the UC, and my participation in the arrest of GREENE, I believe that GREENE is the individual who sold the UC firearms during the September 5 and September 15, 2025 meetings.

<u>Firearms Licensing</u>

18.     Based on my review of records from the ATF's Federal Firearms Licensing database pertaining to gun licenses issued in North Carolina and New York, I know that no record of entry was found reflecting any issuance of a firearms license to JERMAINE STUBBS, the defendant, in the period between February 2025 and September 2025.

19.     Based on my review of records from the ATF's Federal Firearms Licensing database pertaining to gun licenses issued in North Carolina and New York, I know that no record of entry was found reflecting any issuance of a firearms license to DAVEON GREENE, the defendant, in the period between August 2025 and September 2025.

20.     Based on my review of ATF policies and procedures and my discussions with the UC, I know that the UC did not hold an ATF firearms license between February 2025 and September 2025.

19

STUBBS's Prior Felony Convictions

21.     Based on my review of law enforcement records, I have learned that STUBBS has been convicted of at least three felonies, including (1) a January 3, 2017 conviction for malicious conduct by a prisoner in violation of North Carolina Gen. Stat. § 14-258.4, for which he received a sentence of 13 to 25 months' imprisonment; (2) a January 8, 2020 conviction for possession of a firearm by a felon in violation of North Carolina Gen. Stat. § 14-415.1, for which he received a sentence of 9 to 20 months' imprisonment; and (3) an April 6, 2021 conviction for assault with a deadly weapon causing serious injury in violation of North Carolina Gen. Stat. § 14-32(b), for which he received a sentence of 24 to 41 months' imprisonment.

Information Regarding Firearms Stubbs Sold the UC on or about July 11, 2025

22.     Based on my communications with a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF"), who is familiar with the manufacturing of firearms and ammunition, I have learned that the following firearms that STUBBS sold the UC on July 11, 2025 were not manufactured in the State of New York: (1) the Springfield Armory Hellcat 9 caliber semi-automatic pistol, serial number BA119275; (2) the Taurus G2C 9 caliber semi-automatic pistol, serial number ACL491994; (4) the Smith & Wesson Model 469 9 caliber semi-automatic pistol, serial number TAA3657; and (5) the Taurus G3 9 caliber semi-automatic pistol, serial number ADJ665573.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of JERMAINE STUBBS and DAVEON GREENE, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

/s/ Allen Santos, by the Court with permission
Allen Santos
Special Agent
Department of Justice, Division of Alcohol, Tobacco,
Firearms, and Explosives

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this  16  day of September, 2025.

_____
THE HONORABLE ROBYN F. TARNOFSKY
United States Magistrate Judge
Southern District of New York